IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF COLORADO

Civil Action No.

AMANDA BRANNON and L. CHANDLER BRANNON

      Plaintiffs,

v.

KBR, INC., a Delaware Corporation;
KELLOGG, BROWN & ROOT SERVICES, INC.;
KELLOGG, BROWN & ROO, LLC;
HALLIBURTON COMPANY, a Delaware Corporation,

      Defendants

---

**PLAINTIFFS' FIRST COMPLAINT AND DEMAND FOR JURY TRIAL**

---

1.    This lawsuit seeks redress for United States soldiers and others deployed to Iraq and Afghanistan who were poisoned by Kellogg Brown and Root, LLC, KBR, Inc., KBR Services, Inc., Halliburton Company, (hereinafter "Halliburton/KBR" or "Defendants"). These corporations callously exposed service members and others to toxic smoke, ash, fumes and contaminated water. These exposures are causing a host of serious diseases to Plaintiffs, increased risk of serious diseases in the future, and death.

**JURISDICTION AND VENUE**

2.    This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. § 1332.

3.    Venue is proper under 28 U.S.C. § 1391.

**PARTIES**

4.      Defendant KBR, Inc. is a publicly-traded corporation with its principal place of business at 601 Jefferson Street, Suite 3400, Houston, Texas 77002.  Defendant KBR acted at all times relevant to this action individually and through duly authorized agents and employees, who are hereinafter subsumed within the term "Defendant KBR" and "Halliburton/KBR."  Defendant KBR is subject to this Court's jurisdiction.

5.      Defendant Kellogg, Brown & Root LLC is a subsidiary of publicly-traded KBR Inc. with a principal place of business at 505 E. Huntland Dr., Suite 100, Austin, Texas 78752. Defendant Kellogg, Brown & Root LLC acted at all times relevant to this action individually and through its duly authorized agents and employees, who are hereinafter subsumed within the term "Defendant Kellogg, Brown & Root LLC" and "Halliburton/KBR."  Defendant Kellogg, Brown & Root LLC is subject to this Court's jurisdiction.

6.      Defendant Kellogg, Brown & Root Services, Inc. is a subsidiary of publicly traded KBR Inc. with a principal place of business at 4100 Clinton Drive, Houston, Texas 77020. Defendant Kellogg, Brown & Root Services, Inc. acted at all times relevant to this action individually and through duly authorized agents and employees, who are hereinafter subsumed within the term "Defendant Kellogg Brown & Root Services, Inc." and "Halliburton/KBR." Defendant Kellogg, Brown & Root Services, Inc. is subject to this Court's jurisdiction.

7.      Defendant Halliburton is a publicly-traded corporation with a principal place of business located at 1401 McKinney, Suite 24, Houston, Texas 77010.  Defendant Halliburton acted at all times relevant to this action individually and through duly authorized agents and employees, who are hereinafter subsumed within the term "Defendant Halliburton."  Defendant Halliburton is subject to this Court's jurisdiction.

8.      Each Plaintiff is identified in Exhibit A, which is hereby incorporated by reference.

## HALLIBURTON/KBR RECEIVES APPROXIMATELY FIVE BILLION DOLLARS PER YEAR IN EXCHANGE FOR PROMISING TO PROVIDE CONTRACTUALLY-DEFINED SERVICES

9.      Halliburton/KBR voluntarily participates in a government contracting program known as the "LOGCAP."

10.      The LOGCAP was created in 1985, when the United States promulgated a regulation (Army Regulation 700-137) that anticipated the use of civilian contractors in wartime situations.  This regulation created the Logistics Civil Augmentation Program, which is commonly referred to by the acronym "LOGCAP."

11.      The object of the LOGCAP is to retain civilian contractors to handle logistical support tasks in conflict areas.  The LOGCAP permits the government to hire contractors such as Halliburton/KBR to provide waste disposal and water treatment services in conflict areas.

12.      The United States does not mandate participation in the LOGCAP.  As noted in the regulation, "[t]he LOGCAP program is built on the premise that unless war is formally declared by the Congress, contractor performance (with rare exceptions which cannot be the basis for planning) must be voluntary."  Army Reg. 700-137, 2-4 "Risk" (a).

13.      In exchange for significant sums, totaling approximately five billion dollars per year, Halliburton/KBR agreed to abide by the terms of the LOGCAP, as well as the Statements of Work, Task Orders, and Letters of Technical Direction issued under the LOGCAP (hereinafter collectively referred to as "LOGCAP Materials").

14.     The LOGCAP Materials constitute the contract, and set forth the parameters within which Halliburton/KBR needed to perform.  Plaintiffs need discovery to collect all these controlling documents.

15.     Those LOGCAP Materials in Plaintiffs'' possession and on the public record require Halliburton/KBR to provide waste disposal and water treatment services in a manner protecting the health and safety of the service members and civilians accompanying the forces. For example, Section 3.13.5 of one Task Order states: "The Contractor shall adhere to all U.S. Environmental Protection Agency and host country guidelines in handling and disposal of all waste material."  As another example, a Statement of Work imposed a duty on Halliburton/KBR to "minimize any type of smoke exposures to the camp population" in connection with surface burning.  See Statement of Work for MNF/MNC-I Sites in Iraq, Table 8.8.

16.     The Standard Operating Procedure incorporated by the LOGCAP Materials makes clear that protecting human health is the paramount operating principle, stating "in the case of conflicting requirements, [Halliburton/KBR] will comply with the standard that is the more protective of human health or the environment."   SOP 4(a).  The Standard Operating Procedure is "mandatory" (4(a)), and requires Halliburton/KBR "take all possible and reasonable actions to protect human health and preserve the environment."  SOP 5(c).

17.     The Standard Operating Procedure explicitly rejects that proposition that no environmental standards apply in times of conflict:  "During wartime, low intensity conflict, or peacemaking operations, environmental considerations should always be subordinate to operational requirements and force protection.  However, this does not mean that preservation of the natural and cultural environment may be ignored in the execution of orders or in the development of plans, branches, or subordinate plans.  Environmental common sense must be

exercised at all levels to safeguard the health and safety of MNC-1 personnel and local nationals. In many cases environmentally protective practices (e.g., using drip pans, employing waste minimization and segregation) used in peacetime can be maintained during deployments, especially in base camps."

18.     The Standard Operating Procedure warns that failing to comply may result in the "[e]ndangerment of personnel health and safety with potentially adverse acute and/or chronic health impacts, including death, to service members."

### HALLIBURTON/KBR DELIBERATELY EVADES AND INTERFERES WITH GOVERNMENT OVERSIGHT

19.     The LOGCAP vests enormous power in the selected contractor because that contractor becomes the sole provider of all logistical support.   The LOGCAP, as with all government contracting, provides for some government oversight of the contractors.   However, the oversight function depends on the contractors" disclosures to the government.   To date, however, there has been little or no oversight over Halliburton/KBR"s performance under the LOGCAP due to Halliburton/KBR"s actions.

20.     For example, Halliburton/KBR deliberately withheld information from the government that was needed to assess performance.  As detailed in the October 30, 2006, Report to Congress from the Special Inspector General for Iraqi Reconstruction, KBR improperly prevented oversight under the LOGCAP by systematically marking data as "proprietary."   The Special Inspector General explained, "The use of proprietary data markings on reports and information submitted by KBR to the government is an abuse of the FAR and the procurement systems.   . . . KBR is not protecting its own data, but is in many instances inappropriately

restricting the government's use of information that KBR is required to gather for the government."

21.     The Department of Defense Inspector General found that Halliburton/KBR threatened to withhold support for our troops in order to coerce the military to accede to its wishes to receive full and immediate payment contrary to the procurement regulations.  As explained by Charles Smith, the former Chief of Army's Field Support Command Divisions responsible for the LOGCAP III contract, the Army awarded KBR approximately five billion dollars per year under LOGCAP III.  Mr. Smith testified at length before Congress on July 9, 2008, about his service in Iraq.  He explained that Halliburton/KBR evaded the Pentagon's oversight, including by submitting more than one billion dollars of unsupported charges to the United States government.  "The whole process was irregular and highly out of the ordinary. The interest of a corporation, KBR, not the interests of American soldiers or American taxpayers, seemed to be paramount."

22.     On February 16, 2010, the Department of Defense Inspector General found that KBR's improper threats to withhold support from the troops resulted in an Army general authorizing the wrongful payment of millions of dollars to KBR.  See Report on Review of Army Decision Not To Withhold Funds on the Logistics Civil Augmentation Program III Contract, Department of Defense Inspector General Audit dated February 16, 2010.

23.     Halliburton/KBR repeatedly tried to prevent employees and other knowledgeable persons from reporting misconduct and contract violations.  Rick Lamberth, a former KBR employee, testified as follows before Congress:  "As a LOGCAP Operations Manager, it was my duty to report to KBR management when the company was in violation of guidelines and the contract Statement of Work. I witnessed burn pit violations on a weekly basis.  When I tried to

report violations, I was told by the head of KBR"s Health Safety and Environment division to shut up and keep it to myself.  At one point, KBR management threatened to sue me for slander if I spoke out about these violations.  KBR was able to get away with this because the Army never enforced the applicable standards.  KBR's Project Controls Department also kept their information hidden.  During one visit by a representative from DCMA, I heard someone from Project Controls state that it was her job to keep DCMA away from the books during the inspection.  KBR management would brag that they could get away with doing anything they wanted because the Army could not function without them. KBR figured that even if they did get caught, they had already made more than enough money to pay any fines and still make a profit."

## IMPROPERLY DESIGNED AND OPERATED BURN PITS

24.     Under the LOGCAP, Halliburton/KBR receives approximately five billion dollars per year.  The duties undertaken in exchange for that money include waste disposal. Specifically, Halliburton/KBR agrees under the LOGCAP Materials to design methods for, and implement, waste disposal for various Forward Operating Bases ("FOB") and other government sites.  Halliburton/KBR agrees that it will dispose of all waste in a fashion that minimizes safety risks, environmental effects, and human exposures to toxic fumes.

25.     Halliburton/KBR ignores contractual obligations, and instead burns vast quantities of unsorted waste in enormous open air burn pits with no safety or engineering controls.  This misconduct began in 2003 and caused harm to the burn pit Plaintiffs.

26.     Halliburton/KBR burn pits are so large that tractors are used to push waste onto them and the flames shoot hundreds of feet into the sky.  Every type of waste imaginable was and is burned in these pits, including trucks, tires, lithium batteries, Styrofoam, paper, wood,

rubber, petroleum-oil-lubricating products, metals, hydraulic fluids, munitions boxes, medical waste, biohazard materials (including human corpses), medical supplies (including those used during smallpox inoculations), paints, solvents, asbestos insulation, items containing pesticides, polyvinyl chloride pipes, animal carcasses, dangerous chemicals, and  hundreds of thousands of plastic water bottles.

27.     According to the Air Force Institute of Operational Health, burning solid and liquid wastes in open pits generates the following pollutants, among others:  dioxins, particular matter, polycyclic aromatic hydrocarbons, volatile organize compounds, carbon monoxide, hexachlorobenzene, and ash.  Burning medical wastes creates disease-laden aerosols.

28.     Burning plastics emit dioxins, which are known to cause cancer.  Burning pesticides have similar results.  Mixing types of solid waste and heavy metals with burning chemicals releases multiple toxic gases and particulates that can interact in an infinite variety of ways to cause many different toxicities and injuries.

29.     The thick smoke from the enormous burn pits filled with smoke and haze the nearby living quarters of American soldiers and contractors accompanying the force.  At times, the smoke reduced visibility to only a few yards.  The burn pit flames were often colored blue or green from the burning chemicals.  The smells emanating from the pits were noxious. In some instances, the burn pit smoke was so bad that it interfered with the military mission.  For example, the military located at Camp Bucca, a detention facility, had difficulty guarding the facility as a result of the smoke.

30.     Lt. Col Darrin L. Curtis, Ph.D., P.E., a bioenvironmental engineer deployed to Balad Air Base in Iraq from September 2006 to January 2007, was shocked by the manner in which waste was being handled in theatre.  He memorialized his concerns about the hazardous

nature of the burn pit in December 2006, and sent this memorandum to his chain-of-command. He explained "there is an acute health hazard for individuals.  There is also the possibility for chronic health hazards associated with the smoke…. It is amazing that the burn pit has been able to operate without restrictions over the past few years without significant engineering controls being put in place."

31.    Despite those known risks to human health, Halliburton/KBR by its operation and management of the burn pits exhibited a pattern of repeated health, safety and environmental violations, and evinced an utter disregard for human health and the environment.

32.    As former KBR employee Rick Lamberth testified to Congress, Halliburton/KBR repeatedly breached the LOGCAP duties and created hazardous conditions.  Mr. Lamberth, working in both Iraq and Afghanistan, stated: "[w]hile working for KBR, I witnessed KBR employees dump nuclear, biological, chemical decontamination materials and bio-medical waste, plastics, oil and tires into burn pits in direct violation of military regulations, federal guidelines, and the LOGCAP contract Statement of Work. . . . Certain hazardous waste materials are specifically prohibited from being disposed of in burn pits, including PCBs and nuclear, medical and biological waste. Guidelines also prohibit disposal of petroleum, oils, solvents and lubricants in burn pits.  I saw KBR employees burn all of these items in burn pits in Iraq.  From as close as ten feet away, I saw nuclear, biological, and medical waste, including bloody cotton gauze, plastics, tires, petroleum cans, oil and lubricants thrown into burn pits.  Vermin, wild dogs, and jackals would roam the pits, carrying off debris."

33.    Lamberth explained that Halliburton/KBR's misconduct was not limited to any single burn pit location:  "I personally witnessed this type of activity occurring in Iraq at camps at Balad, Taji, Tikrit, Kirkuk, Camp Bucca and Camp Cropper and in Afghanistan at Bagram

Airfield and Camp Phoenix, all among the largest bases we operate in these theaters.  The burn

pits varied in size and location."

34.     Mr. Lamberth further explained that Hallburton/KBR, in addition to operating the

burn pits, was responsible for the design and locating certain burn pits:  "At Camp Speicher, one

of the pits was 25 feet by 25 feet and about 50 to 60 feet deep. KBR built the pit upwind from the

living quarters, so all smoke traveled downwind to where soldiers were living, which in some

cases was as close as one quarter of a mile. This was in violation of the LOGCAP statement of

work and Army regulations. KBR was supposed to site burn pits downwind from living quarters.

KBR routinely ignored this guidance. Instead of consulting a Health and Safety Engineer, they

would just choose a site out of expediency. If done right, it would have only taken a day to do the

proper wind flow analysis."

35.     Lamberth explained that Halliburton/KBR was motivated by money to opt to use

burn pits rather than other available means of waste disposal, such as incinerators:  "By

continuing to use burn pits and claiming that these sites are, expeditionary," KBR is able to drag

out the life of the LOGCAP III contract and continue to get taxpayer dollars.  If KBR can

convince DOD that the sites are still expeditionary, they get to rollover the existing LOGCAP III

contract."

36.     Another Halliburton/KBR former employee testified before Congress that

Halliburton/KBR"s financial motivations repeatedly led to burning everything in the pits rather

than ensuring that useable items were given to the government: "These pits were burning 24

hours a day. I saw large amounts of new plywood and other lumber ordered to be taken by fork

lift 24 hours a day to the burn pit.  At Al-Asad, a large waste dump and burn pit had many items

that appeared to be in perfectly good condition, yet were discarded.  I saw flack vests, black and

green jungle style combat boots, olive drab field jackets, ammunition crates, tires, inner tubes, and a large volume of food items.  These items were going to waste in the burn pits."

37.     Halliburton/KBR's own internal documents admit that their health, safety and environmental personnel failed to operate and manage the burn pits in a safe manner.

## HALLIBURTON/KBR BREACHED
## CONTRACTUAL AND COMMON LAW DUTIES

38.     Halliburton/KBR breached two types of duties owing to Plaintiffs.  First, Halliburton/KBR breached its contractual duties by failing to abide by the terms of its contract with the United States.  Second, Halliburton/KBR breached its common law duties to exercise due care and to refrain from injuring persons.

39.     KBR breached these two duties in two different ways.  First, in some locations (such as Camp Speicher), Halliburton/KBR was responsible for designing and locating one or more burn pits.  On these occasions, Halliburton/KBR breached its contractual and common law duties by failing to locate these burn pits in a manner that reduced the harmful effects on human health.  Instead, although Halliburton/KBR knew that burn pits release known carcinogens and respiratory sensitizers into the air, Halliburton/KBR failed to properly design and locate the pits, and instead created a severe health hazard for Plaintiffs, causing both acute and chronic health problems.

40.     Second, even in those instances when Halliburton/KBR did not design and locate the burn pit, Halliburton/KBR managed and operated the day-to-day operations of the burn pits.  Halliburton/KBR made a series of day-to-day operational decisions, such as the hours of burning, the substances that could be burned together, whether accelerants (such as jet fuel) were used, whether materials were sorted and segregated, and other such day-to-day operational

PLAINTIFFS' FIRST COMPLAINT AND DEMAND FOR JURY TRIAL

decisions.   Halliburton/KBR failed to fulfill its contractual and common law duties in making these daily decisions.

41.   Instead of properly managing and operating the burn pits in a manner designed to lessen the risks to human health, Halliburton/KBR failed to impose even the most rudimentary controls, and instead burned everything all mixed together, often using jet fuel as an accelerant. Such conduct created tremendous risks.  As described by Shira Kramer, Ph.D., testifying before Congress, "Many of the chemical by-products and particulates generated from waste burning interact synergistically, meaning that the toxicity of the mixture of chemicals and particulates is greater than that of the individual chemicals."  Such misconduct breached Halliburton/KBR's contractual and common law duties, and created hazardous conditions that caused harm to the burn pit Plaintiffs.

42.   Halliburton/KBR cannot claim it lacked knowledge that poorly-run burn pits could harm service members and others.  Halliburton/KBR was put on notice by the government, the media, and by their own employees.

43.   Halliburton/KBR's misconduct cannot be attributed to the United States.  The government did not prevent Halliburton/KBR from disposing of the wastes in a safe manner that would not have harmed Plaintiffs.  The government never caused or compelled Halliburton/KBR to operate and manage the burn pits in an unsafe manner harmful to service members.  Indeed, under the terms of the LOGCAP, the government hired Halliburton/KBR to provide safe and effective waste disposal, not waste disposal that harmed service members.

44.   Reasonable discovery will show that Halliburton/KBR maintains documents that reflect substantial internal discussion of the known harms.  Halliburton/KBR willfully failed to use safer, alternative means to achieve a safer method of waste disposal.

45.     Halliburton/KBR's two forms of misconduct (improper design/improper day-today operations) breached both contractual and common law duties, and seriously injured Plaintiffs and the Class Members.

46.     The paragraphs in this section of the Consolidated Complaint (i.e. paragraphs 40-45) are incorporated in full into each and every Count.

## CONTAMINATED WATER

47.     Halliburton/KBR also breached contractual and common law duties with regard to water treatment.  Halliburton/KBR is the main providers of bulk water used in dining, medical, personal hygiene and recreation facilities. KBR's Government and Infrastructure ("G&I") business unit provides program and project management logistics to the U.S. military operating in Iraq.

48.     The LOGCAP incorporates government standards, including but not limited to TB MED 577, establishes field water quality standards and water certification processes, and defines operational and oversight rules. Halliburton/KBR is contractually required to comply with these and other water safety standards.

49.     The TB MED 577 standards provide detailed requirements for the sanitary control and quality surveillance of land-based field water support. All water used for drinking, cooking and medical facilities must be potable.  Water used for laundry and personal hygiene, bathing, and cleaning may be non-potable but must meet certain minimum safety standards as outlined in TB MED 577.

50.     Halliburton/KBR is required to monitor and maintain the quality of water it distributed to meet the established standards.  Halliburton/KBR is required to inspect and maintain distribution and storage tanks, chlorinate water supplied and ensure proper levels of

PLAINTIFFS' FIRST COMPLAINT AND DEMAND FOR JURY TRIAL

chlorine residual.  The water distribution and point-of-use storage containers were an integral part of the water supply system and were required to be installed, operated and maintained in accordance with applicable government regulations.

51.     Halliburton/KBR repeatedly failed to meet the applicable standards and supplied water which was contaminated, untreated, and unsafe.  Halliburton/KBR failed to perform water quality tests, and failed to monitor point-of-use storage containers.  Halliburton/KBR failed to treat the water properly, including by failing to chlorinate water.

52.     As but one example, the Inspector General for the United States Department of Defense ("DOD") stated in its Audit of Potable and Nonpotable Water in Iraq, Report No. D-2008-060 (March 7, 2008): "From March 2004 to February 2006, the quality of water provided by [KBR] contractors, through treatment or distribution at three of the sites we visited, was not maintained in accordance with field water sanitary standards as specified in the Department of Army Technical Bulletin (Medical) 577, "Sanitary Control and Surveillance of Field Water Supplies," March 1986 with revisions December 15, 2005 (TB MED 577)."

53.     The DOD Inspector General found that "KBR did not implement established water quality monitoring controls."  Specifically, KBR did not perform water quality tests on the water stored in point-of-use containers at Camp Ar Ramadi and Camp Victory, and did not use the correct standards and processes for water treatment at Camp Q-West.

54.     The DOD Inspector General concluded "[n]oncompliance with the established controls resulted in water of unknown quality being used for personal hygiene by U.S. forces on Camp Ar Ramadi (approximately 7,300 personnel) and water purification facility wastewater being used in personal hygiene units at Camp Q-West (approximately 5,000 personnel)."

PLAINTIFFS' FIRST COMPLAINT AND DEMAND FOR JURY TRIAL

55.     The DOD Inspector General further concluded that KBR "exposed U.S. forces to unmonitored and potentially unsafe water."

56.     Despite the LOGCAP requirements, Halliburton/KBR failed to train its personnel in proper water operations and failed to generate and retain the proper documentation regarding water operations.

**HALLIBURTON/KBR IS LIABLE FOR THEIR EMPLOYEES' MISCONDUCT**

57.     Halliburton/KBR is responsible for supervising and managing their employees assigned to the LOGCAP.  Halliburton/KBR cannot shift this responsibility to the military.  The LOGCAP dictates that "contract employees will not be under the direct supervision or evaluation of the military. . .. "  Army Reg. 700-137, 3-2 "Contract Considerations" (d)(2).

58.     The LOGCAP also requires that contractors "will provide the supervisory and management personnel for each contract as well as on-site liaison with functional U.S. organizations. Army Reg. 700-137, 3-2 "Contract Considerations" (d)(2).

59.     The United States designed the LOGCAP to ensure that contractors would not handle inherently governmental tasks, and would not become combatants.  See Army Reg. 700-137 at 3-2 "Contract Considerations" (d)(5) (contractors "may not be used in any role that would jeopardize their role as noncombatants") and (d)(8) (contractors will not be used to perform inherently governmental functions.)

60.     The LOGCAP Materials, such as Statement of Work for the MNF/MNC-1 Sites in Iraq 1.10, make clear that Halliburton/KBR, not the government, is the responsible party.  In a section entitled "Operational Control (OPCON)," the Statement states "In the context of this SOW is defined as the Contractor being fully responsible performing the function, service or capabilities specified by the Government.  The Contractor shall report performance outcomes as

required in the individual paragraphs.  The Contractor shall maintain supervisory control both technical and administrative over all Contractor employees." See also 6.0  Contractor Personnel Requirements (The Contractor shall have exclusive supervisory authority and responsibility over its employees.).

## COUNT ONE
## NEGLIGENCE

61.     All allegations and facts in paragraphs 1-60 are hereby incorporated by reference.

62.     Halliburton/KBR owed duties to design, manage, and operate the burn pits in a safe manner.

63.     Halliburton/KBR owed duties to provide safe drinking water for drinking, swimming and hygienic purposes.

64.     Halliburton/KBR negligently failed to design, manage, and operate the burn pits in a safe manner.

65.     Halliburton/KBR negligently failed to provide safe drinking water.

66.     Plaintiffs suffered serious physical harms from exposures to the burn pits.

67.     Plaintiffs suffered harm from exposure to unsafe water.

68.     Halliburton/KBR's negligence was the proximate cause of harm to all Plaintiffs.

## COUNT TWO
## BATTERY

69.     All allegations and facts in paragraphs 1-68 are hereby incorporated by reference.

70.     Halliburton/KBR contaminated the air by failing to design, manage, and operate the burn pits in a law-abiding and safe manner.  Halliburton/KBR knew that Plaintiffs would come into contact with the smoke, fumes and haze from the burn pits and that they would not consent to such contact.

71.     Halliburton/KBR supplied water contaminated with hazardous substances knowing that such water would come into contact with Plaintiffs and knowing that Plaintiffs would not consent to such contact.

72.     Plaintiffs did not consent to contact with smoke, fumes and haze contaminated with numerous unsafe substances from the burn pit.Plaintiffs did not consent to contact with contaminated water.

73.     Halliburton/KBR's actions were unlawful and Halliburton/KBR acted in willful disregard of Plaintiffs' right to be free of exposure to and contact with hazardous substances.

### COUNT THREE
### NUISANCE

74.     All allegations and facts in paragraphs 1-73 are hereby incorporated by reference.

75.     Plaintiffs had a right to be free from irritating and hazardous smoke from improperly designed and operated open air burn pits and to be free of the hazards that arose when chemicals, plastics, heavy metals, and medical and other waste are burned on an improperly-sited open air burn pit.

76.     Plaintiffs also had a right to be free from toxins provided in contaminated water.

77.     Halliburton/KBR substantially and unreasonably interfered with those rights when they improperly designed, managed, and operated open air burn pits and provided contaminated water to Plaintiffs.

78.     Plaintiffs suffered physical injuries from the illegal and hazardous design and operation of the open air burn pits.

79.     Halliburton/KBR"s actions are the proximate cause of Plaintiffs' injuries.

### COUNT FOUR
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

80.     All allegations and facts in paragraphs 1-79 are hereby incorporated by reference.

81.     Plaintiffs have been diagnosed with injuries as a result of Halliburton/KBR's misconduct in exposing Plaintiffs to smoke, haze and fumes containing hazardous substances through Halliburton/KBR"s negligent design, management, and operation of the open burn pits and through contaminated water provided to them.

82.     Plaintiffs have suffered physical harm and severe emotional distress due to these injuries.

83.     Plaintiffs have suffered severe emotional distress as a result of the prolonged exposure to hazardous smoke and fumes and contaminated water.  This distress has been exacerbated by Plaintiffs' fears and uncertainty regarding their own health risks caused by these exposures, and by Plaintiffs' awareness that many other American soldiers and other residents of the military bases and camps have become seriously ill, been diagnosed with serious and potentially fatal diseases, and in some cases have died from the physical injuries and diseases caused by the exposure to hazardous smoke and fumes and contaminated water.

84.     Halliburton/KBR's negligent conduct is the cause of the Plaintiffs' emotional distress.

## COUNT FIVE
## OUTRAGE/ INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

85.     All allegations and facts in paragraphs 1-84 are hereby incorporated by reference.

86.     Plaintiffs have suffered from extreme stress and severe emotional distress due to Halliburton/KBR's outrageous actions.

87.     Halliburton/KBR's conduct was intentional and reckless and Halliburton/KBR knew or should have known that injury and emotional distress would likely result from their conduct.

88.     Halliburton/KBR's conduct in operating and managing the burn pits was outrageous, intolerable and certainly offends generally accepted standards of decency and morality. Halliburton/KBR's conduct caused Plaintiffs' severe emotional distress. Halliburton/KBR's conduct in designing, managing, and operating burn pits and subjecting Plaintiffs to constant exposure to smoke, haze and fumes contaminated with hazardous substances. Given that Halliburton/KBR inflicted these harms on Plaintiffs when they were stationed overseas serving our nation, the misconduct is so outrageous in character and so extreme in degree as to be utterly intolerable in a civilized community. Halliburton/KBR knew or had reason to know that their actions would create a risk of harm and they deliberately proceeded to act, or failed to act, in conscious disregard of that risk of harm.

89.     Halliburton/KBR's conduct in providing sewage water for the U.S. forces to swim and bathe in and taking millions of taxpayer dollars as payment was outrageous and intolerable and certainly offends generally accepted standards of decency and morality. Plaintiffs have suffered severe emotional distress from knowing that they were constantly exposed to thick smoke, fumes and haze which contained numerous chemicals and hazardous substances and from learning that they were bathing and brushing their teeth with sewage water.

90.     Plaintiffs' severe emotional distress which resulted from the prolonged exposure to hazardous smoke and fumes and contaminated water has been exacerbated by Plaintiffs' fears and uncertainty regarding their own health risks caused by this exposure, and by Plaintiffs' awareness that many other American soldiers and other residents of the military bases and camps have become seriously ill, have been diagnosed with serious or fatal diseases and in some cases have died from the physical injuries and diseases caused by the exposure to hazardous smoke and fumes and to contaminated water.

## COUNT SIX
## WILFUL AND WANTON CONDUCT

91.　　All allegations and facts in paragraphs 1-90 are hereby incorporated by reference.

92.　　Halliburton/KBR owed Plaintiffs duties to provide safe waste disposal services and safe water.  Halliburton/KBR breached those duties and proximately and directly caused harm to Plaintiffs.

93.　　Halliburton/KBR was conscious of their conduct in failing to adequately provide safe waste disposal services and safe water.

94.　　Halliburton/KBR were conscious from their knowledge of the surrounding circumstances and existing conditions that their conduct would naturally and probably result in injury to Plaintiffs.

95.　　Halliburton/KBR demonstrated either a deliberate intent to harm Plaintiffs, or an utter indifference to and conscious disregard for the welfare of Plaintiffs.

## COUNT SEVEN
## NEGLIGENT HIRING, TRAINING AND SUPERVISION

96.　　All allegations and facts in paragraphs 1-95 are hereby incorporated by reference.

97.　　Halliburton/KBR had a duty to hire competent personnel, and properly train and supervise them in the design, management, and operation of the burn pits in a safe manner.

98.　　Halliburton/KBR had a duty to properly train their personnel in water supply safety and military water standards and in proper testing, reporting and administrative procedures, and proper maintenance and oversight procedures.

99.　　Halliburton/KBR breached those duties.

PLAINTIFFS' FIRST COMPLAINT AND DEMAND FOR JURY TRIAL

100.    Halliburton/KBR's wholesale failure to ensure it hired, trained and supervised personnel able to design, manage, and operate an adequate waste disposal system and water supply system was the direct and proximate cause of injury to Plaintiffs

## COUNT EIGHT
## BREACH OF DUTY TO WARN

101.    All allegations and facts in paragraphs 1-101 are hereby incorporated by reference.

102.    Halliburton/KBR had a duty to warn Plaintiffs when Halliburton/KBR learned there were safety issues arising from its design, management, and operation of the open air burn pits and with the water supply.

103.    Halliburton/KBR failed to warn Plaintiffs, and this failure was the direct and proximate cause of injury to Plaintiffs.

## COUNT NINE
## MEDICAL MONITORING

104.    All allegations and facts in paragraphs 1-103 are hereby incorporated by reference.

105.    Plaintiffs have been exposed to dangerous levels of known and unknown hazardous substances in the air and water as a direct result of the misconduct of Halliburton/KBR.

106.    This exposure has resulted in serious physical health problems for Plaintiffs.

107.    Plaintiffs' exposure to known and unknown hazardous substances is a direct result of Halliburton/KBRs negligence in its unsafe design, management, and operation of the burn pits and water supply system.

PLAINTIFFS' FIRST COMPLAINT AND DEMAND FOR JURY TRIAL

108.    Plaintiffs face an increased risk of contracting future diseases as a direct and proximate result of the prolonged and constant exposure to thick smoke, fumes, haze and contaminated water which contained numerous hazardous substances.

109.    Plaintiffs have a reasonable fear of contracting a future disease as a direct result of the exposure to hazardous substances caused by Halliburton/KBR.

## COUNT TEN
## FUTURE MEDICAL EXPENSES

110.    All allegations and facts in paragraphs 1-109 are hereby incorporated by reference.

111.    Plaintiffs have been exposed to dangerous levels of unknown hazardous substances in the air and water as a direct result of the misconduct of Halliburton/KBR.

112.    This exposure has resulted in physical health problems for Plaintiffs.

113.    Plaintiffs' exposure to numerous hazardous substances is a direct result of Halliburton/KBR's negligence and intentionally reckless conduct.

114.    Plaintiffs' injuries will result in Plaintiffs incurring future medical expenses, both as a result of physical injuries and as a result of an increased risk of contracting future diseases as a direct and proximate result of Halliburton/KBR's misconduct.

115.    Plaintiffs will demonstrate the likely cost of such future medical treatment and monitoring at trial.

## COUNT ELEVEN
## BREACH OF CONTRACT

116.    All allegations and facts in paragraphs 1-115 are hereby incorporated by reference.

PLAINTIFFS' FIRST COMPLAINT AND DEMAND FOR JURY TRIAL

117.    Halliburton/KBR entered into contractual agreements with the United States Department of Defense.

118.    Halliburton/KBR had a duty under these contracts to design, manage, and operate a safe waste disposal system and water supply system that operated without exposing United States Military personnel and contractors accompanying the force to hazardous substances.

119.    Plaintiffs were the intended Third Party Beneficiaries of these contracts.

120.    Halliburton/KBR breached their obligations under these contracts by failing to design, manage, and operate a proper waste disposal system and water system that met the terms of the contract, and the military standards incorporated by reference in the contract.

121.    Plaintiffs were injured by exposure to hazardous substances from the waste burn pits and water system designed, managed, and operated by Halliburton/KBR in breach of Halliburton/KBR's contractual obligations.

122.    Plaintiffs' injuries were proximately caused by Halliburton/KBR's breaches of their contractual obligations.

## JURY DEMAND

Plaintiffs request a Jury Trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Award Plaintiffs monetary damages to compensate each Plaintiff for his or her physical injuries, emotional distress, fear of future disease, and need for continued medical treatment and monitoring;

B. Award Plaintiffs punitive damages in an amount sufficient to strip Halliburton/KBR of all of the revenue and profits earned from their pattern of constant, wanton and outrageous misconduct and callous disregard and utter indifference to the welfare of Americans serving and working in Iraq and Afghanistan, who depend on Halliburton/KBR to properly and safely dispose of various forms of waste and who depend on Halliburton/KBR not to create hazardous conditions and not to release toxins into the air;

C. Award attorneys' fees and costs to Plaintiffs for legal services provided in the pursuit of this suit; and,

D. Grant such additional and further relief as the Court deems just and proper.

DATED: August 31, 2012

Respectfully submitted,

*/s/ J. Kyle Bachus*
J. Kyle Bachus
W. Richard Kroeger
BACHUS & SCHANKER, L.L.C.
1899 Wynkoop Street
Denver, CO 80202
(303) 893-9800
kbachus@coloradolaw.net
Richard.Kroeger@ColoradoLaw.net

PLAINTIFFS' FIRST COMPLAINT AND DEMAND FOR JURY TRIAL